FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
**Jun 5, 2024, 3:45pm**
Lucy H.Carrillo, Clerk of Court

1  Kent Davis
2411 Carolina ave
2  Twentynine Palms, California 92277

3  IN THE UNITED STATES DISTRICT COURT

4  FOR THE DISTRICT OF HAWAII

5  KENT DAVIS,                                        Case No.: 23-CV-00346-DKW-WRP

6              Plaintiff,

7  vs.                                                PLAINTIFF'S FIRST AMENDED COMPLAINT

8  KULA KAI VIEW ESTATES COMMUNITY
ASSOCIATION A NON FOR PROFIT
9  CORPORATION, KULA KAI VIEW ESTATES
COMMUNITY ROAD MAINTENANCE
10  ASSOCIATION A NON FOR PROFIT
CORPORATION, IT'S OFFICERS, IT'S AGENTS, ET      JURY TRIAL DEMANDED
11  AL, JOHN WILSON, RIC ELHARD, MARY WILSON,
THEODORE STANTON, SCOTT LANE, KAREN
12  LANE, SHAWN LOHAY, LARRY HAYES, DOES 1-        JUDGE WATSON
50 , AND ALL UN-NAMED PARTIES
13
              Defendants,
14

15                    PLAINTIFF'S FIRST AMENDED COMPLAINT
16

17
      The Plaintiff, Kent Davis hereby files his complaint against the Named Defendants, their agents, does 1-50 and
18
all unnamed defendants.
19

20      1.  **JURISDICTION AND VENUE**
21
This Court has Jurisdiction and Venue over the subject matter of this action under Federal Laws such as State
22
Regulation and Treaty. There is complete Diversity of Citizenship between this Plaintiff and the Defendants in this
23
case. The Amount in Dispute to this action, exclusive of interest and costs, exceeds the sum of $75,000. Therefore
24
this court has Jurisdiction over the dispute un 28 U.S.C. 1332
25
This court has personal jurisdiction over all of the defendants because the defendants are domiciled in Hawaii.
26
Venue in this District is proper under 28 U.S.C. 1391(b)(1) because the Defendants reside and do business within
27
this State.
28

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 1

## 2.   THE PARTIES

Plaintiff is an individual who has been domiciled in the State of California since 1981. Plaintiff resides in Twentynine Palms, California and is a citizen of the State of California.

Defendants The individuals and the officers it's employees, corporations, it's agents et al, does 1-50, do and all unnamed parties do business and reside in the State of Hawaii.

## 3.   THE AMOUNT IN CONTROVERSY

The amount in controversy-the amount the plaintiff claims the defendant owes or the amount at stake-is more than $75,000, not counting interest and costs of court.

### STATEMENT OF CLAIMS

(Assault-Battery-False Imprisonment-Civil Conspiracy-Invasion of Privacy-Libel-Defamation per se-Intentional Infliction of Emotional Distress-Negligent Infliction of Emotional Distress-Trespass-Trespass to Land-Negligence-Negligence Per Se-*Res Ipsa Loquitur*-Private Nuisance-Fraud-Fraudulent Concealment- Breach of Contract-Violation of Civil Rights 14th Amendment 34 U.S. Code 12361-Discrimination upon Sexual Orientation-Continuing Wrongs)

Plaintiff hereby incorporates Exhibits A (the USB device) through L evidence, filed with Plaintiff's Complaint, filed on July 26, 2023 and Exhibits A through T filed with:

PLAINTIFF'S FIRST AMENDED COMPLAINT:

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 2

1  EXHIBITS A through T :

2  "A" USB device containing multiple evidential videos.

3  "B" Declaration of Mary Wilson.

4  "C" Sworn statement of Ikaika Gonzalez.

5  "D" Sworn affidavit of Ikaika Gonzalez.

6  "E" Ikaika Gonzalez' emergency room report dated March-24-2019

7  "F" Billing Statement from Porter Devries initiated April 6, 2019.

8  "G" Proof of mailing of payments to the defendant mailed from 29 Palms California on February 22, 2021.

9  "H" Copies of postal money orders paid to the defendant.

10 "I" Defendants yearly dues statement for $7,981.04 dated January 1, 2021.

11 "J" Copy of Priority envelope addressed to Gail Lamson dated February 22, 2021.

12 "K" Copy of three year Injunction against officer and president of the hoa, defendant Theodore Stanton.

13 "L" Copy of an email from Theodore Stanton sent to Plaintiff's email address.

14 "M" Copy of Plaintiff's Cease and Desist Demand dated and served October 13, 2018.

15 "N" Copy of refund check written by officer and accountant, defendant "Mary Wilson" dated  April 6, 2021.

16 "O" Copy of Hawaii Civil Rights Commission complaint dated May 25, 2023.

17 "P" Copy of text from officer and defendant Ric Elhard sent plaintiff.

18 "Q" Copy of an Unrelated" docket filed in a public forum by defendant Mary Wilson.

19 "U" Copy of a Forged Document filed in a public forum by defendant Mary Wilson.

20 "R" Copy of defendant Mary Wilson's Facebook page.

21 "S" Copy of Plaintiff's final Bankruptcy closed docket and related Bankruptcy documents.

22

23                    **CONCISE STATEMENT OF FACTS**

24

25       A.  Plaintiff incorporates all allegations pled herein:

26       This is an action arising from a Civil Conspiracy to commit Intentional Overt Acts, Assault, and various other

27  Torts against the Plaintiff. Plaintiff and a friend from California Colin, moved onto the property in a camper on

28  approximately July 5th, 2018 to oversee improvement property in the subdivision defendants manage.
   PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 3

1

2        B.  John Wilson, then president and Ric Elhard an officer of the association(s) in the weeks following then

3    Did freely give advice and permission where to place a privacy fence on the association's right of way. Officers of

4    Home Owners Associations are granted authority as elected officers to make agreements and exceptions to the

5    ByLaws. Subsequently the HOA amended their Bylaws over 10 times. After the fence was completed another

6    officer of the association Sam Wheatman who drove by every day, stopped and advised the Plaintiff and Plaintiff's

7    friend that "he" thought the fence might possibly be in the right of way. Mr Wheatman politely informed the

8    Plaintiff to measure thirty three feet from the center of the road to find the edge of the right of way. Mr Wheatman

9    drove away. Plaintiff called mr Wilson. Plaintiff and Colin met with him at his home. Plaintiff and his Colin had a

10    civil conversation regarding what mr Wheatman told Plaintiff. Mr Wilson told Plaintiff and his friend not to pay

11    attention to what mr Wheatman said, that he was old. Mr Wilson then commented that Mr Wheatman was sick and

12    would be passing away anyway. Ric Elhard was shooting the grade on the property to pour the slab and had placed

13    an order for the materials to build the forms for the slab. Plaintiff brought up to mr Elhard what mr Wheatman told

14    plaintiff. Mr Elhard told plaintiff not to pay attention to mr Wheatman and that mr Wheatman should mind his own

15    business. Therefore, Wilson and Elhard officially ratified their advice and agreement/contract regarding the

16    placement of the fence. It was evident that Wilson and Elhard were fairly long-time acquaintances of mr Wheatman

17    and had a good relationship with him. Subsequently there were three meetings held. The second and third meeting

18    focused on the issue with the fence, and the granting an easement granting access to a parcel of land onto another

19    subdivision which the Wilson's officers later purchased. The officers voted on an exception to the ByLaws to grant

20    the easement. Plaintiff and his friend Colin attended all three meetings. The first meeting mentioned the fence but

21    did not go into the subject in detail. During the second meeting the officers stated the fence was a protentional issue.

22    Plaintiff and an independent attendee asked why it had turned into an issue. Mr Wilson stated the board membership

23    had changed and a new officer had been elected. The new officer was Faye Miller. The idea was floated by Mr

24    Gracinin that the fence should be granted an easement. Mr Gracinin an officer made a motion to create an easement

25    for the fence. Davis agreed with his motion. Without a vote, Mr Wilson declared "There will be no easement". Up

26    until this point Plaintiff had relied on the integrity and the authority of the officers of the association mr Wilson and

27    mr Elhard. Then Mr Gracinin suggested conducting a survey of (the property). He stated he had a surveyor that

28    would perform the survey for $500. Davis agreed to pay $500 for the survey "of the property".

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 4

1

2        C.   In 2017, before plaintiff planned on going to the property plaintiff discovered on Google Earth that

3        1,200

4  tiles wrapped in three white tarps (that the next-door neighbor to the south had placed out of site in a puka) had been

5  disturbed. By email plaintiff asked mr Wilson to go to the property and inspect the tile. Mr Wilson reported back in

6  an email and attached photos of himself standing by the pallets. The tile was gone. The only things that remained

7  were the two pallets the tiles were stacked on and two rotted doors. Three $500 doors were purchased by the Grantor

8  in 2008 and left with a different neighbor by the name of Elias Padilla. Padilla was also holding a $600 toilet. Padilla

9  had offered to keep the items covered in an empty barn. Now two of those doors were destroyed and had been left

10  by the tile. Mr Wilson suggested contacting that neighbor without naming him. Months later the Grantor sold her

11  house in California and decided to build her new home on the property. The property she had purchased in 1990.

12  After the Grantor moved to her other property in California plaintiff prepared and traveled to Hawaii to oversee the

13  construction of her home. After plaintiff arrived he made friends with Elias Padilla's partner and the new neighbor

14  in the house next door to the south. Plaintiff made a police report about the stolen tile and the doors. That particular

15  neighbor to the south and his wife immediately volunteered information about their bad experiences with mr Padilla.

16  They went into a lot of detail and told plaintiff he was lucky Padilla was back in Mexico. The husband told Plaintiff

17  that he was a probation officer and mentioned that Padilla had been deported. Plaintiff inquired about mr Padilla

18  with Elhard and Wilson. They made mention that Padilla had unfortunately gotten on drugs. Soon after the probation

19  officer and his wife put their house on the market. Not without incident. Plaintiff and his friend encountered a young

20  man yelling on the short cul de sac in front of the adjoining properties. The realtor later said it appeared the young

21  man had spent the night in their house. The house sold to a Gentleman from Germany. Within a few weeks after the

22  previous owner's house sold, plaintiff heard extremely loud music coming from the property that Padilla's partner

23  owned Regoria Reyes. Plaintiff went to investigate and knocked on the door. Padilla came around the corner. Padilla

24  had returned to the island. Plaintiff explained why he was there and then asked Padilla what had happened to the

25  doors and the toilet. Padilla hesitated did not answer and then drew up his fist as if to strike plaintiff. Plaintiff

26  promptly left and told Padilla he was going to call the police. Plaintiff promptly called the police. The police officers

27  told plaintiff to file for an Injunction from Harassment. Plaintiff did and the court hearings began. There were so

28  many hearings on the Injunction request they had to be re-filed multiple times. Despite there being admitted

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 5

evidence and a witness to the Harassment, Colin, Judge DeWeese months later denied the Injunction.

In the meantime "Someone" kept stealing five and six solar lights at a time. The police were called multiple times. Plaintiff produced the receipts. The police offered comments that there was only one person that would have the ability to sneak down and steal the lights while plaintiff and his friend were gone. Eventually Padilla testified that the solar lights were disturbing his sleep. Padilla also admitted during his testimony that he placed the doors by the tile because he assumed the Grantor was not coming back. Padilla screamed one day "I'm going to kill you, you fucking haole". Colin testified about that incident in front of judge DeWeese. DeWeese continued to do nothing about the injunction. So many more incidents with Padilla took place over the next three years it is hard to list. Reportedly, Padilla has since been killed by one of his friends.

        D.   Over the past 5 years after the fence issue continues to be a subject with the association and it's
            multiple

newly elected officers. After the survey was conducted Ric Elhard text Plaintiff and informed Plaintiff that he was given "Bad Advice". At a meeting plaintiff agreed to move the fence if the survey proved it was in the right of way so plaintiff was cooperating. The surveyor showed up one day on the street. Plaintiff went out to meet the person parked on the street. It was the surveyor. The surveyor determined with plaintiff's assistance that one of the stakes was in the wrong place. There were 5 property line stakes stretched over 6 feet apart. The north west corner marker was gone. The surveyor and Plaintiff searched in the rocks and found a small rusted thumb tack. The surveyor said that tacks were often used many years ago. While plaintiff and the surveyor chatted and worked together mr Wilson drove up and parked 300 feet away. Wilson passed by the surveyor and approached the plaintiff. Wilson walked into plaintiff's personal safety space and Wilson mouthed the words "Fuck You" (so the surveyor could not hear him). Plaintiff backed up two feet and said "get away from me". Wilson approached plaintiff again and did the exact same thing Walked into Plaintiff's personal safety space. This time he said "I can do anything I want, I'm on a public street". Plaintiff backed up four feet this time and said "get away from me, I'm going to call the police". Wilson turned and walked toward the surveyor.  Plaintiff took out his phone and took a couple of photographs of Wilson and the Surveyor. Plaintiff was admittedly in shock by Wilson's actions. Plaintiff did not understand why Wilson was even there. The survey was of the property. Mr Wheatman had proved that Mr Wilson did not know where the

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 6

1   right of way boundary was and it appeared that Wilson was taking his anger out on plaintiff. The boundary was on

2   Wilson's property 2 miles away, as well. The boundary ran for miles in the subdivision up and down both sides of

3   the road. Wilson nor Elhard mentioned or advised plaintiff to get a survey. Plaintiff had mentioned to Wilson and

4   Elhard that in California the utility easement was one foot inside the property line. They both agreed and said that

5   that was a good idea. The fence was placed one foot beyond the telephone pole. Plaintiff went back to working with

6   the surveyor. Wilson followed "us" around and at one point stood menacingly directly over Plaintiff. Plaintiff was

7   talking to the surveyor about the third stake and then agreed with him that the fence was in the right of way. Plaintiff

8   marked all *three* corners *that the surveyor located,* with rocks. Plaintiff started making plans to move the fence, as

9   he told the association he would (if it proved it were in the right of way).

10      E.   Plaintiff informed the officers he was "misled" about the fence location and that they had broken the

11  agreement. Then officer Elhard offered to help move the fence with another man mr Davis. Mr Davis had a tractor

12  to dig the new fence post holes. Plaintiff was in the process of rectifying the situation with the help of Elhard.

13  Officer Elhard who gave plaintiff "bad Advice" about where to place the fence. Progress of moving the fence was

14  being made.

15      F.   Mary Wilson began contacting plaintiff by driving up and down the road glaring at plaintiff.

16  Plaintiff began experiencing post traumatic stress disorder, depression, among other symptoms. Plaintiff served the

17  association officers a Cease and Desist Demand in October of 2018. The association officers defied the demand on

18  several occasions. Grantor began looking for a new trustee in September of 2018, because the harassment by the

19  officers didn't stop. In late 2018 a responsible individual in Los Angeles agreed to be the trustee.

20  An official yearly public hoa meeting was held in late January 2019. Plaintiff and another friend Ikaika who was

21  born on the island recorded the meeting. The Grantor traveled from California to attend the meeting. The meeting

22  subject was pointedly about the fence even though the fence was in the process of being relocated. A string line had

23  been put up on the edge of the right of way and post holes were being dug. Padilla made multiple comments about

24  plaintiff during the meeting. Officer Karen Lane refused to let plaintiff respond to Padilla's comments. After the

25  meeting several individuals came to plaintiff and said they agreed with plaintiff. In the meantime, Padilla had

26  become increasingly aggressive.

27      G.   On 3-14-2019 Plaintiff went up the street to pick up a ladder and saw a chicken feed bag on the side of

28          the

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 7

road. Plaintiff went to retrieve the trash and discovered Padilla had posted four signs along the road claiming plaintiff stole a pipe from him. Padilla had *just been served* a TRO the day before. While plaintiff was taking photos from inside his vehicle, Padilla and his partner Regoria Reyes came to the side of the road. Padilla started yelling at plaintiff. Plaintiff having his camera out taking photos of the signs, turned on the video. Padilla came to plaintiff's vehicle window and reached in the window. Padilla scrambled around for something to grab laying in the seat. Padilla exited and picked up a rock. He went to the front of the driver's side of the vehicle. Padilla then retreated threw the rock down and continued to yell at plaintiff calling plaintiff gay twice. Plaintiff left and called the police. The police did not arrest Padilla for violating the tro even though the officer watched the video and saw the tro. The Officer, Ross called a few weeks later and asked plaintiff for a copy of the video. After Ross had it for two or three days, he called plaintiff and asked for another copy of the video. In the police report Ross did not mention the fact there was a tro, and he did not mention the fact that Padilla called plaintiff gay more than once. When a few more solar lights and cameras were damaged and disappeared, the police attempted mediation with Padilla and plaintiff on the side of the street. One officer recorded it. Plaintiff sat on a rock and asked if Padilla if he would stop trespassing, stealing, yelling, playing extremely loud music, slandering, and making discriminating statements such as calling plaintiff gay. Padilla agreed to stop. Plaintiff then asked Padilla if he would cage his hundred chickens and thirty peacocks. Padilla said "I don't have control over them, they belong to Regoria"

Plaintiff called Officer Keltner for a copy of the recording and he said he had erased it. The officer said Padilla had asked for a copy too. Sometime after, a nice neighbor, a woman in her 50's who took walks along the street everyday stopped and told plaintiff that Mary Wilson was sending out emails to all of the owners on the association's email list about the plaintiff. She said that Wilson was telling everyone plaintiff was gay. This same woman told plaintiff she stopped to talk to Padilla one day. She said she found a baby chick by the road and took it to him. She told plaintiff she asked Padilla why he was so abusive towards plaintiff. She said Padilla told her he had stopped trying to do meth but he had no control over it. The woman also said in Mary Wilson's emails Wilson were claiming plaintiff caused the issue with the fence. She said that Wilson was making other derogatory remarks about plaintiff. A woman, an off island owner of property in the subdivision, who was also on the email list, contacted plaintiff and asked plaintiff for his phone number. She called and informed plaintiff that several owners were threatening violence toward plaintiff. Plaintiff inquired why. She said because of the fence issue and the people on

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 8

1   the mailing list are telling everyone you are gay. She made comment that she lived in an exclusive neighborhood in

2   Maui. She warned plaintiff that one of her neighbors killed one of his drug friends. She said the man had inherited

3

4   the house. She said the man got away with it because he was a "local".

5        H.   The lady that took walks on the street told plaintiff that she had been to a party with her roommate Ken

6   at a couple's house in the lower subdivision. She said "they were getting high on pot and talking about you". She

7   said she did not do drugs and said it was a curious watching them. She said she asked them why they were so

8   obsessed about the fence and plaintiff. She said they replied "because that place has a building permit, and our house

9   does not" She said they went on talking about how everything they had from selling their house in California was

10   tied up in their unpermitted house. She said she told them that making an issue about the fence will only bring

11   attention to their problem. She said they continued on rambling about Davis but she lost interest and walked outside.

12        I.   Almost daily Mary Wilson would drive by the property. If Plaintiff and Colin were outside she would

13           slow

14   down and glare at us. Plaintiff did not respond. Mary Wilson made a persistent special effort to harass plaintiff

15   seeing she lived two miles away. In 2018 after the fence issue began, plaintiff believes Mary Wilson made an

16   agreement with John Wilson both officers of the hoa to harass plaintiff thus creating the initial Civil Conspiracy.

17        J.   On 3-23-2019 Mary Wilson assaulted plaintiff's friend Ikaika when he served John Wilson a second

18   subpoena for the video of the 2019 public official yearly hoa meeting. Plaintiff, his mother, and Ikaika had a legal

19   right to the video because their images were captured on the video. Also any party to the hoa had the right to the

20   video. Mary Wilson and John Wilson were responsible for recording the video. Interestingly enough Plaintiff had

21   suggested months earlier a video should be taken and distributed to all interested parties and corporation

22   stockholders of the hoa association.  Plaintiff requested a copy of the video from the defendant several times .

23   Plaintiff told the defendant he would file a small claims complaint to get the video. Plaintiff wanted the video for

24   evidence in a tro hearing regarding Padilla. Defendants refused to produce the video.

25        K.   Ikaika served a subpoena for the video without incident. When Ikaika served the small claims

26           complaint

27   with a subpoena for the video John Wilson answered the door and pushed Ikaika. Ikaika took his camera out and

28   started his video recording. Mary Wilson came out of the house and started yelling at and pushing Ikaika. Then

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 9

1    Mary Wilson ordered her dogs to bite Ikaika, (which one did). Mary Wilson called him names while she continued

2    to push him. He politely and in a civil manner laid the envelope containing the subpoena and a small claims

3    complaint for the video on a chair on the porch. Mary Wilson continued her actions as she followed Ikaika up the

4    driveway. At a distance from Mary Wilson about 20 feet away, at the top of the driveway, Ikaika turned to get a

5    clear shot of Mary and her dogs. Which he did. Mary Wilson was fully aware Ikaika had captured the entire incident

6    on video. Ikaika filed a request for an injunction. Judge DeWeese signed and issued a tro. A hearing date was set.

7    Ikaika and plaintiff appeared at the hearing. Ikaika hired William Reece at a cost of $1,000, who did not appear. Mr

8    Reece without notifying Ikaika sent a different attorney to appear for him. She was not fully aware of all of the facts.

9    Plaintiff and Ikaika played the video for her several times. Ikaika explained in detail what happened and presented

10   her evidence of his visit to the emergency room that evening, the emergency room physician's report, and photos of

11   his "dog bites". Plaintiff sat next to them because plaintiff had downloaded the video onto his computer so that the

12   judge could view it. After their discussion, they left together. Plaintiff sat on one of the picnic tables outside the

13   courtroom. Mary Wilson and her attorney, and an older man who witnessed the "second" assault by Mary Wilson on

14   the street sat on the next picnic table over. Plaintiff had sent the same video to the HOA email about 10 days before

15   the hearing. Wilson knew plaintiff had the video because plaintiff played it five or six times at the picnic tables.

16   Mary Wilson could not see it, but it was purposely turned up to full volume so they all could hear it. Plaintiff

17   overheard her attorney say "don't worry, we have attorney client privilege".

18        L.   The hearing was called. Plaintiff and Ikaika sat in the audience with the computer. The case was called

19   last. The sheriff who sat close to plaintiff and Mary Wilson who heard the dog bite video many times was already in

20   the courtroom when the case was called. Wilson's attorney told the judge plaintiff was a potential witness despite

21   plaintiff not witnessing the dog bite and assault, He asked that plaintiff be removed from the courtroom.

22   Unfortunately plaintiff took the computer with the video ready to play with him. Plaintiff sat outside during the

23   entire hearing thinking Ikaika would come get the computor. When Ikaika came out he told plaintiff "that judge is

24   mad at you". Plaintiff replied "I wasn't even there when that happened". Ikaika replied "I don't think she cares".

25   Before Ikaika's attorney left plaintiff asked her why she didn't play the video. She said "she wouldn't have allowed

26   it anyway". Plaintiff said "It proved the whole thing happened". She gave no further explanation. Plaintiff and

27   Ikaika drove to Mr Reece's office and asked him why he wasn't there. Mr Reece said he was busy. Plaintiff asked

28   why the attorney didn't play the video. He said "I wasn't there". Plaintiff and Ikaika became suspicious.
     PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 10

M. On 3-23-2019 at approximately 9am after the dog bite incident, "We" drove down the street 150 feet from the Wilson's driveway and parked on the "right of way". We stayed in the car. Ikaika had shown me the dog bites.. There were multiple puncture wounds. Five minutes after Mary Wilson had assaulted Ikaika, and ordered her dogs to bite him. Ikaika looked in the rear view mirror and said "Here she comes again". I told Ikaika to drive away but he froze. You could hear her screaming from inside the closed and running car because the air conditioner was on. As she approached the driver's door plaintiff got out of the car on the opposite side. Then Ikaika got out of the car. Wilson advanced toward Ikaika holding her phone up and still screaming. Fearing she would assault him again, Davis came around the car to get between them. Instead Ikaika got between Wilson and plaintiff while plaintiff's back was against the car. Wilson held the phone over Ikaika's shoulder placing it within inches of plaintiff's eyes while screaming. Plaintiff had not done anything to her. Plaintiff had never contacted her. Ikaika held plaintiff's hands and plaintiff could not protect himself. Wilson was bumping into Ikaika's back trying to hit plaintiff with her phone. She was screaming "assault assault" while she was bumping up against Ikaika's back. Plaintiff was trapped helpless against the car by Ikaika. Plaintiff fearing for his own safety broke one of his hands free. Plaintiff was able to stop Wilson from damaging his eyes by knocking it out of her hands. Plaintiff had no other remedy to stop what she was doing. It was later learned the phone was by the car and was stepped on and driven over. Mary Wilson entered the vehicle "illegally and without permission'. She exited with plaintiff's laptop and Ikaika's Mandolin in their respective cases. Ikaika got the personal property back by taking it from her hands. Plaintiff was under the impression that he helped but Ikaika swore he was the one that took them. He put them back in the car. Wilson got back in the car and came out with both items a second time. Plaintiff remembers taking them from her this time while she struggled not to let go while screaming obscenities at Plaintiff. Plaintiff pulled Wilson from the driver's doorway and got in the car. Plaintiff told Ikaika to get in next to him. He did but the door would not close. Plaintiff put the car in gear. Ikaika got out. Ikaika's dogs that were in the car had escaped. He stayed with them. Plaintiff went back to pick up Ikaika and the dogs. Plaintiff saw Mary Wilson standing on the road screaming at him.. When plaintiff drove up he saw and heard Ikaika say to Wilson "this is all on you lady".

N. We drove down the subdivision and stopped at the abandoned property Ikaika was trying to buy. Plaintiff waited by the car for the police, and Ikaika sat under a shade tree thirty feet away. He was distraught. When the police drove down the main road plaintiff flagged them down. They saw plaintiff and backed up. There were three cars and they pulled up within 20 feet of plaintiff. Officer Siesta, DoDo, and Barto got out. They asked "me" if

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 11

1  I had "her" phone ? I replied "No". Barto went to Ikaika under the tree and was speaking to him but plaintiff could

2  not hear them. Plaintiff tried to walk toward them and Siesta said "you stay here". Barto came back and said Ikaika

3  says his stomach is hurting and wants some time. Barto started scattering things in the car. Siesta began doing the

4  same thing in the back seat after he let the dogs out. Barto said "I found a phone cover". Several weeks earlier

5  Plaintiff took two laptops and several old phones of Ikaika's and donated them. One of Ikaika's laptops was thrown

6  away because Ikaika had run over it. Ikaika said he was keeping them because they had a lot of old photos and

7  things on them. Plaintiff said "if you haven't gotten them by now it must not be that important". That's how the

8  phone cover got in the car. Officer Barto said to Siesta, "Do you have enough ?" Siesta went to his car and brought

9  back a piece of paper. He said "these are your rights here". Plaintiff replied "I do not have my glasses". Plaintiff

10 asked Barto if Wilson admitted ordering her dogs to bite Ikaika. He said "she said Ikaika was bitten". Siesta put

11 handcuffs on plaintiff without explaining why. Ikaika was still under the tree and did not see what was going on.

12 Siesta drove plaintiff to the station 20 miles away in handcuffs. Plaintiff asked why he was doing this. He said

13 "We're not talking about it". Plaintiff told officer Barto while Siesta and DoDo watched, that he did not take her

14 phone.

15        O.    After six or eight hours they told Plaintiff "Ikaika is calling the station". Ikaika later said he didn't

16 even know where everyone had gone. He said "I finally looked up and no one was there". He said "I went to your

17 place and I looked all over". For many more hours plaintiff was at the station. After dark Plaintiff was transported

18 65 miles away. Ikaika was there and after a few hours was permitted to post bail for plaintiff. Plaintiff and Ikaika

19 went straight for the Kona Community Hospital Emergency room and were admitted. Plaintiff suffered a twisted

20 ankle from taking his property back. His knees were injured. Ikaika had multiple dog bites. Plaintiff took photos of

21 "all" of the injuries. We went to Ikaika's place and stayed there for a couple of days. When we went back to

22 plaintiff's place it was quiet. Plaintiff received a text from Ric Elhard, the officer that approved the fence location

23 and worked for a day to help dig the post holes along with his friend. It said "You are not welcome here".

24        P.    Ikaika filed a tro request against Mary Wilson, and Plaintiff filed his tro request against her which was

25              also

26 approved. Plaintiff's hearing for an Injunction against Mary Wilson was a few weeks later. It was held a day or two

27 after Ikaika's tro hearing. Ikaika asked Mr Reece "do I need to be at Kent's hearing ?" He replied no. The day after

28 the arraignment plaintiff called mr Reece and said "When is the court hearing about the assault" He said "I don't

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 12

know let me look". It had passed. Plaintiff said "We'd better get over there" Plaintiff and Reece went to the

courthouse. Reece went to the clerk to let them know we were there to appear. Plaintiff was arrested while Reece

was with the clerk. He asked plaintiff to sign a paper and Reece left. Plaintiff called Ikaika and Ikaika posted bail for

not being at the hearing at the time it was scheduled. After the hearing Plaintiff and Ikaika went to Mr Reece's

office. Mr Reece had no explanation why he left. The second tro hearing between Mary Wilson and Plaintiff was

held and Mr Reece did not show up. Just before the hearing plaintiff text mr Reece and he replied that he was in

another courtroom. Judge DeWeese refused to continue the hearing even though plaintiff told her what Mr Reece

said. Plaintiff was forced to appear and plaintiff put his laptop on the table. Plaintiff told the judge he had a video he

wished to present as evidence. Judge DeWeese said "I've had it with your videos" Davis had never presented any

videos to her in the past.

       Q.    At the first hearing Mary Wilson admitted she followed Ikaika to his car and confronted both plaintiff

and Ikaika when they got out. She said she did not know plaintiff was in the car. She was not able to give a valid

reason why she approached Ikaika's car. She knew his car. Plaintiff possibly recollects she admitted she had seen it

more than once. There are videos of that hearing. Mr Reece was present and took Wilson's testimony so the videos

shouldn't be edited. Other hearing videos have been edited. The second tro hearing was very suspicious. DeWeese

said she was not Mr Reese's "babysitter" when plaintiff asked that his attorney be present for his testimony. She

denied plaintiff's request thus "Denying Davis' Dur Process". No judgment shall be rendered without the party

being given the opportunity to testify and without the party testifying. The hearing lasted an hour as did the first

hearing. DeWeese denied plaintiff's tro and granted Wilson's tro resulting in a three year Injunction. Davis never

having or needing to have direct contact with Wilson in the past or in the future seemed ok. Plaintiff did not

understand why his against Wilson was not granted. Wilson's declaration which is Under Oath she claimed

countless times that plaintiff and Ikaika were "boyfriends".Plaintiff believed it was very odd that the judge ignored

the facts of the case. She refused to watch plaintiff's video and refused to allow plaintiff counsel of record.

The hearing regarding Wilson's criminal allegations against plaintiff, was held just a few days later. Plaintiff went to

get a copy of the video, transcript, and order on the tro hearings. The clerk said the judge in the hearing being held

today has them. Plaintiff asked why, she replied "because she is allowed". The Prosecutor, Sherry Lawson was very

rude and aggressive. The judge suggested to go outside and work something out. Mr Reece told plaintiff to sign a

1   bunch of papers without letting plaintiff read them. Then the hearing was resumed. Apparently the papers said

2   plaintiff agreed to go to jail for seven days, and plaintiff pled to Third Degree Assault. A misdemeanor.

3   During the hearing the judge was very rude to plaintiff and kept interrupting plaintiff. Mr Reece explained what

4   happened to the phone and what Wilson did. There is an unedited video of the hearing. Plaintiff's attorney explained

5   about the phone. Plaintiff explained his injuries. Mary Wilson admitted she did not seek medical attention at this

6   hearing and the tro hearing. She told the officers she had been beaten and her hair was pulled. She told them she

7   stole plaintiff's laptop. She told them plaintiff stole her phone and her glasses. Mr Reece never let plaintiff see the

8   police report. It was three years before plaintiff was allowed a copy by the police report. At this hearing Mary

9   Wilson told the judge she was beaten on both sides of the head with "open fists and closed fists' 20 or 30 times by

10  the plaintiff. A woman that had been beaten like that would have gone to the hospital. Her testimony was utterly not

11  believable since plaintiff is a man and Wilson is a "poor defenseless woman who goes around assaulting men".  The

12  judge said in front of thirty people, "you are lucky mr Davis she was not more seriously injured" Plaintiff said "I am

13  the one that was injured". The judge started raising her voice in front of the entire audience, knowing Wilson did not

14  seek medical attention, and knowing plaintiff did, the judge sentenced plaintiff to thirty days in jail, a year of anger

15  management, and a year probation. Plaintiff walked away in shock. The paperwork plaintiff signed also agreed to

16  pay Wilson $400 for her phone, which she filed paperwork that it cost her $200 to replace. The paperwork also said

17  plaintiff agreed to pay Wilson $400 for her glasses. Wilson filed paperwork that her health insurance company paid

18  for new glasses. Plaintiff thinks if Wilson did not reimburse the insurance company the $400, Wilson defrauded

19  them. After the hearing plaintiff told Ikaika what happened. He said "I should have been there". Mr Reece had told

20  Plaintiff and Ikaika it was not necessary for Ikaika to go. Ikaika said I should have gone anyway. Plaintiff agreed.

21  Plaintiff began preparing for the stay. Plaintiff's mother flew from California to stay at her property. Plaintiff was

22  despondent for awhile. Plaintiff had attended a prestigious Military school. Plaintiff hoped it was going to be like

23  that. It was much more confining. There was a lot of meth being done by several guys. They were hiding it in the

24  drop down ceiling. Plaintiff spoke to the guards about it but they did not do anything. It was an abusive place, both

25  physically and mentally. There were a couple of disabled guys being physically pushed around by the "tough guys".

26  Plaintiff complained and was reprimanded. There were several instances where plaintiff was physically abused by

27  two different guards. One was trying to physically provoke plaintiff for asking for a blanket. Plaintiff was

28  transferred to a different facility (in handcuffs) for taking a piece of bread with him after dinner. Everyone did

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 14

1   that…. It was False Imprisonment from the start. Wilson committed Perjury at three different court hearings. At

2   Ikaika's tro hearing Mary Wilson denied pushing and ordering her dogs to bite him. Mary Wilson listened to the

3   video recording of her screaming and ordering her dogs to bite Ikaika five or six times before that hearing. She had

4   watched it. Her attorney Porter DeVries told plaintiff and mr Reece that he had watched the video.

5

6   Porter DeVries mailed a list of proposed legal fees to defend the tro Plaintiff filed against Mary Wilson. Plaintiff did

7   not get a copy so plaintiff could not object to Mary Wilson's legal fees. They totaled just over $10,000 for just two

8   one hour hearings. During the hearing regarding legal fees for defending Ikaika's tro Mary Wilson's attorney asked

9   for legal fees. Judge DeWeese said "We'll get to that". No bill for legal fees was from Mr DeVries was ever sent to

10  the judge in that case. Plaintiff contends that Mr DeVries billed plaintiff to defend Ikaika's tro and the judge coluded

11  in that scheme. Otherwise why would Mr DeVries not bill for defending Mary Wilson legal fees for holding a

12  hearing to Defend her. This is the hearing where Mary Wilson knowingly denied assaulting and ordering her dogs to

13  bite Ikaika which is Perjury. In Mary Wilson's declaration she discriminated against Ikaika as well by declaring

14  under oath that Ikaika and plaintiff were in a perceived homosexual relationship. Mr DeVries composed her

15  declaration. Mr DeVries had seen the video and encouraged or allowed Mary Wilson to lie on the stand. Which is

16  Subornation. Mr DeVries also encouraged Mary Wilson to lie during the tro hearing defending and prosecuting the

17  dualing tro's regarding plaintiff and Mary Wilson which is also on video. Plaintiff contends that someone employed

18  by the state of Hawaii edited the video of that hearing. Also there was a hearing held without plaintiff just before the

19  tro hearing while plaintiff was texting Mr Reese just outside the door. Plaintiff has the recording of that video. The

20  hearing was held for Mr Wilson violating three subpoenas for refusing to present the video of the yearly meeting.

21  Plaintiff asked Mr Wilson if he brought the video to court with him. He said yes, but it's up to the judge if I have to

22  give it to her. Officer Keltner and the bailiff met with Mr Wilson outside the courtroom in the waiting area. When

23  plaintiff went to investigate what they were saying, they all three looked up and officer Keltner approached plaintiff

24  and spoke to plaintiff about his there to appear which had nothing to do with the video. In the hearing regarding Mr

25  Wilson's violating the subpoenas judge DeWeese asked Mr Wilson if he had the videos. He replied "there were so

26  many subpoenas. The judge fined Mr Wilson $25 for violating three subpoenas at total of $75 which was to be paid

27  to some other organization, not the court. Judge DeWeese did not order Mr Wilson to produce the video supporting

28  plaintiff's case for harassment. After that n a declaration Mr DeVries composed and filed with the court he declared

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 15

1    there was never a video. Plaintiff has a copy of the video of the 2019 yearly meeting where Mrs Wilson adjusted

2    their camera which was pointed at the audience on a tripod.  Mr DeVries lied to the court. During the hearing that

3    followed officer Keltner and the bailiff being seen outside the courtroom speaking to Mr Wilson plaintiff raised that

4    issue and the bailiff denied he was outside the courtroom speaking to officer Keltner and Mr Wilson. There was no

5    reason to lie about it. Being a lawyer he knew it was a lie and he knew his actions could be reported to the state bar.

6    Both attorneys that appeared for Mary Wilson engaged in subornation. The fact they encouraged Mary Wilson and

7    made a false declaration can still be turned in to the state bar. Mary Wilson was a licensed practicing nurse when she

8    ordered her dogs to bite Ikaika and she lied about it in court. Some months later she put her license on hold. The

9    video of the assault and the video of the resulting hearing can still be turned into the American Nurses Association.

10   Her license would most likely be revoked once they viewed the videos and took her statement why she did what she

11   did and why she lied about seeing she took a Hippocratic oath not to hurt a human being.

12   Plaintiff was ordered to report for his thirty days of being falsely arrested seeing there was no probable cause and no

13   evidence, ordered to attend anger management, and placed on probation.  When plaintiff received a letter ordering

14   plaintiff to relocate the same fence that Mr Wilson and Mr Elhard advised plaintiff to locate it in the right of way.

15   The letter gave plaintiff ten days to move the fence and pay for the survey of the right of way of the hoa's road. The

16   same road officer Wheatman informed plaintiff how to find the border of the right of way, and the survey that was

17   supposed to be of the property. Plaintiff complied with the timeline by moving the fence the ninth day. Plaintiff paid

18   the $500 the survey the surveyor quoted to plaintiff in an email. Plaintiff sent the surveyor $500. The surveyor sent

19   the money to the hoa. They wrote an email back and said they did not receive it. He told plaintiff in an email sent it

20   again. The hoa replied that their attorney advised them not to accept it. The surveyor said "their" survey of the road

21   cost $1000.  Plaintiff sent the surveyor another $500. The Plaintiff also sent the Defendant the balance of $500

22   seeing the surveyor was attempting to pay the defendant $500.

23          R.   The hoa mailed a bill for the letter and the survey to the former owner of the property. Their

24   accounting of paying mr DeVries to defend Mary Wilson began just days after Mary Wilson hired mr DeVries to

25   represent her in the two tros. That accounting demonstrated the fact that the bill for approximately $6,800 DeVries

26   billed for a two page letter was evidence that the fee was actually used for Mary Wilson's legal fees, not a two page

27   letter. The bill for Mary Wilson's legal fees were disguised for writing a letter for the two page letter was "mailed"

28   to plaintiff. Plaintiff eventually paid Mary Wilson's legal fees the hoa billed the wrong party. At this point, the

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 16

1  property was in the name of a different trust. The bill was mailed to the former owner. Plaintiff had to sell his car to

2  pay the bill himself. The plaintiff had resigned as the trustee and mailed the trust and all the related documents to the

3  successor trustee. There was no money left in the trust. The money had been used to improve the property. The new

4  owner demanded plaintiff pay Wilson's legal fees that had been disguised as the lawyer's fee for a two page letter

5  and a survey. In the attorney's letter it said if the fence and the survey issue was not resolved there would be legal

6  costs billed. The terms of the letter had been complied. All of the money the attorney billed was paid. This matter

7  and the false billing resulted in "Concealment" In the meantime Mary Wilson put a lien on the property of the new

8  owner. She did not send the new owner a notice of intent to file the lien. If the owner had been noticed the new

9  owner would have contested the lien. Mary Wilson's declaration why she placed the lien on the property was filed

10 with the lien. Her notarized declaration was notarized by a licensed Notary who was also a local licensed real estate

11 broker, and a personal friend of Mary Wilson's. The broker was required to advise Mary Wilson that the declaration

12 was not proof that she had the legal right to file the lien. Her declaration was strictly speculative. Mary Wilson's

13 legal fees had been paid which were based on judge DeWeese's judgement. The owner contested the lien with the

14 hoa Karen Lane president and Mrs Wilson in writing. They refused to release the lien. After a few years the property

15 was returned to the Grantor of the trust. The trustee resigned after many attempts to work things out with the hoa

16 and Mary Wilson's attorney Edward Fetzer. 90% of the trustees letters were notarized since Mr Fetzer made an issue

17 that he did not believe the trustee was who he said he was. Mr Fetzer claimed anyone could get a licensed notary to

18 notarize the letters of plaintiff posing as the trustee. It turned out (recently) Mr Fetzer never confirmed with the

19 notary that the trustee did in fact present his identification. But, Karen Lane must have contacted the notary in

20 Kansas who notarized one of the trustees letters. Noone knows how Karen Lane was able to get the trustees 102 year

21 old aunts contact information. Karen Lane contacted her by telephone and threatened her to give her the trustee's

22 phone number. Karen Lane called the trustee and left two voicemails in which she rambled on about the plaintiff.

23 Karen Lane left her personal phone number on her voicemail. At the time she left the voicemail it is believed that

24 she was the president of the hoa which had nothing to do with plaintiff at this point in time. Her voicemail is

25 evidence of defamation, and libel. The trustee sent plaintiff a letter about Karen Lane's actions. He also delivered to

26 plaintiff a copy of Karen Lane's voicemail.

27 Karenn Lane's husband is the person who came to the Grantor's property and ranted about plaintiff being a "Satanic

28 Sodomite" and told the plaintiff to come to the street. Plaintiff ignored Mr Lane. But plaintiff recorded the entire

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 17

1    incident with his phone. Mr Lane knew he was being recorded and he knew plaintiff's mother was a witness since he

2    saw her watching.

3    The day of the incident with Mary Wilson March 23rd, 2019 Ikaika caught Ric Elhard on the Grantor's property

4    where plaintiff was staying. Mr Elhard had been helping move the fence on the property. Ikaika told Mr Elhard to

5    leave. Ikaika told Mr Elhard if he wanted to speak to plaintiff he should contact plaintiff when he was there. Plaintiff

6    was not there. Ikaika also caught Mr Padilla on the property. When plaintiff returned to the property it had been

7    burglarized. The electricity had been turned off and all of the security cameras were destroyed. Plaintiff called the

8    police and officer Michaels was one of the officers that responded. Officer Michaels made the comment "you're the

9    one that assaulted that lady and were arrested". He did not come there to discuss the issues with Mary Wilson. He

10    was there to take the report and to get some fingerprints on the cabinet doors and the entrance door handle. All of the

11    electronics were stolen, building materials, plaintiff's file on mr Padilla regarding the tros Padilla was defending.

12    Plaintiff's identification was also stolen. Plaintiff later gave a full list to officer Michaels which he initially refused

13    to accept. Once he did plaintiff took photos of it in Michaels hand which showed his badge % to prove he did

14    receive it. The photo intentionally did not capture Micheal's face. About a month after the property, the new barn

15    was burned to the ground. All of the building materials in it were destroyed. The fire destroyed the camper parked 5

16    feet from the barn. Plaintiff left to see a movie with Ikaika about noon. The fire happened around 6:30. The neighbor

17    Shawn Loway apparently was the only person that called the police. There were several people that came onto the

18    property without permission who were trespassing. The camper worth $30,00 was a total loss. The barn was worth

19    $20,000. The building materials burned cost was roughly $3,000. A vehicle jack was stolen. There was a lot of

20    damage and the loss was devastating to the Grantor. The damage was estimated about $65,000. Mr Wilson filed a

21    tro against plaintiff directly after the fire. In his declaration he said plaintiff threatened to take him to court if he

22    posted plaintiff's name on the public message board again. And he felt threatened. Mr Wilson also said in his

23    declaration that he thought the fire resulted from plaintiff's making bombs and booby traps. Mr Wilson dismissed

24    the tro the day of before the hearing. Plaintiff appeared and plaintiff stated to the judge Wilson probably was not

25    there because he would be questioned about his declaration. The judge agreed. Nevertheless, Mr Wilson's

26    declaration is of public record and slanders plaintiff. The question begs, why is the president of the hoa filing

27    defamatory declaration and frivolous tro's against plaintiff. Wilson supposedly was not on the property that day. Mr

28    Loway emailed plaintif about the fire. Mr Loway stated very clearly that he saw plaintiff at the property before and

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 18

1   during the fire and he had five other witnesses. Plaintiff questioned the validity of his statement. Plaintiff told him he

2   should tell the police what he was saying in writing in a public forum, the hoa email site. Plaintiff told Loway he

3   was going to call the police so Laway could tell them what he witnessed and tell them who his witnesses were. The

4   police promptly came to take his statement. The officers said they saw him in his house but he would not answer the

5   door. Mr Loway emailed plaintiff and withdrew his statement to plaintiff. Plaintiff has copies of those emails. Since

6   then Loway has made two declarations that the camper was destroyed because taccording to him the campers

7   propane tanks were in the back of the camper near the fire. He claims that's the reason the camper burned. In fact,

8   the propane tanks are secured to the trailer hitch in the front of the camper. The question begs, why would Loway

9   involve himself with the fire at all. An intelligent person or an officer of the hoa,would not comment or speculate

10   about the fire, the ownership of the Grantor's property, and be calling the trustee ranting about the plaintiff in a

11   voicemail. Why would the hoa's attorney be contesting the notary's license ? What is the purpose of all of these

12   defamatory statements about the plaintiff ? Plaintiff believes these individuals had full knowledge of what their

13   actions constituted. The hoa's attorney Edward Fetzer and Mary Wilson claimed in court documents and in hoa

14   emails that plaintiff was impersonating the trustee, thus stealing his identity. The Trustee composed a notarized

15   affidavit and or declaration regarding the incident with his 102 year old aunt and a separate affidavit that at no time

16   has plaintiff stolen his identity. Plaintiff has copies of these sworn documents and many others that the trustee gave

17   plaintiff. After all of this, plaintiff and Ikaika went swimming in the pool on the property. Then Mr Padilla, Mr

18   Florez (a man that lives two miles away, and Padilla's partner Regoria Reyes wrote sworn declarations that plaintiff

19   and Ikaika were harassing them by swimming in the pool and that plaintiff and Ikaika were engaged in homosexual

20   activity. The filed a request for a tro that was denied. In their tro they filed multiple photos of plaintiff and Ikaika in

21   the pool. None of the photos evidenced the plaintiff and Ikaika engaged in homosexual activity. Their declarations

22   constituted Defamation and Libel since they are writings that can be viewed by the public. Padilla, Florez and Reyes

23   claimed they were harassed when they purposely watched plaintiff and Ikaika swimming in the pool. This incident

24   alone constituted Invasion of Privacy. The incident with Reyes and Padilla on their property while Padilla was

25   calling plaintiff gay constitsue Invasion of privacy. The police were called because more solar lights were stolen.

26   While they were there officer De'Angelo witnessed Padilla on the roof with a video camera on a tripod. She said

27   "he's filming us. Why is he on the roof ?" Two other officers witnessed Padilla on the roof.

28

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 19

1 | Plaintiff was told by one officer that he was supposed to get evidence that Padilla was playing loud music because
2 | by the time they got there he was turning it off. Padilla also had a police scanner that he turned up almost daily.
3 | Plaintiff could hear it. One day Plaintiff was documenting and filming the loud music as he was instructed by the
4 | police. Plaintiff was on the respective property, not trespassing. Plaintiff recorded it for several minutes. Padilla and
5 | Reyes came onto the porch and started yelling at plaintiff "Get the hell out of her you fucking haole !". Then Padilla
6 | ran off of the porch and threw a rock at plaintiff. Plaintiff filmed the rock land within two feet of plaintiff. Plaintiff
7 | did respond in like to Padilla and said "Go back to Mexico". Plaintiff walked away 300 feet and called the police.
8 | Officer Ross, officer Lorenzo, and another officer all watched the video. The third officer stated "why didn't you
9 | hide behind the fence ?". He went to take Padilla's statement. Plaintiff later got a copy of Padilla;s statement and
10 | Padilla did admit to throwing the rock at plaintiff. Reyes stated "they told each other to leave". The third officer
11 | arrested Padilla. Officer Ross said he was going to arrest the plaintiff. Plaintiff called Ikaika and said to the officers
12 | "You can't arrest him for that". Lorenzo and Ross told Ikaika "Yes we can" Ikaika said "For what ?" Ross nor
13 | Lorenzo did not respond. They ordered plaintiff to get off the phone. After thirty minutes Ross handcuffed plaintiff
14 | and another officer arrived and transported Padilla and plaintiff to the police station together who both sat in the
15 | back seat. Padilla tried to make conversation with the officer and he told Padilla to be quiet. The officers booked
16 | plaintiff and plaintiff was not allowed to make a statement. The third officer walked in while plaintiff was on the
17 | phone with Mr Reece and yelled at plaintiff "you cannot make a statement". Mr Reece said yes he can. The officers
18 | ordered plaintiff to get off the phone and took Plaintiff's phone out of his hand, hung up and placed the phone on the
19 | desk.After they were through plaintiff asked for a ride home. They told plaintiff he could not wait for a ride at the
20 | station even outside under the roof overhang. The officers ordered plaintiff to go outside in the rain. Plaintiff was
21 | forced to walk a mile and a half down a busy highway to the nearest tree for shelter from the rain. Plaintiff waited
22 | two hours for Ikaika to come pick him up.
23 | Plaintiff paid Mr Reece to get the charges dismissed. The prosecutor filed charges for harassment. Mr Reece and
24 | plaintiff met with a different prosecutor after a hearing in a conference room outside the courtroom. Plaintiff turned
25 | on the video and handed the phone to the prosecutor. After he finished watching it he said you did nothing wrong.
26 | He said I will dismiss the charges. They were dismissed and Mr Reece gave plaintiff a copy of the judgment. It said
27 | the charges were dismissed in "Nolo prosequi". This meant the plaintiff's Constitutional Rights were violated.
28 | Plaintiff did not file a complaint in time.

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 20

1  Plaintiff also paid Mr Reece to prosecute and defend him in the tro cases regarding Mary Wilson. Plaintiff paid

2  Ikaika for posting bail for plaintiff. A total of roughly $1,800. Only $500 was returned several months later. Plaintiff

3  was forced to borrow all of this money and the money to pay Mary Wilson for a phone and glasses which was over

4  $800. At this point Mary Wilson and Padilla had cost the Plaintiff over $4,000. The burglary cost was over $2,000.

5  Plaintiff called to speak to the prosecutor Sherry Lawson about Mary Wilson's false police report. Mr Reece said

6  "they are already mad at you. They said they will find something else to charge you with if you call them again".

7  A few months after all of this Ikaika decided to sign his declaration regarding Mary Wilson's assaulting him and

8  Plaintiff on the street on March 23, 2019. He said he felt intimidated about signing it because he had been

9  threatened. Plaintiff asked him "By who ?" Ikaika would not say.

10  After the incident with Mary Wilson, the burglary, and the fire, Carol Napier text Plaintiff and asked him to call her.

11  We text back and forth before and after the phone conversation. She said officer Michaels replied to her when she

12  asked him what they were going to do about all of this stuff going on with plaintiff. Ms Napier said "Officer

13  Michaels said "We are not going to help him because he is in a relationship with a known homosexual" She said she

14  said to him "What does that matter ?". She said "he just left". She said "he was there following up on her stolen

15  credit card". Plaintiff asked her if he could call the station and complain about Michaels. She said yes and you can

16  give them my name. Plaintiff called and spoke to the Captain. Plaintiff told him what Carol said. The Captain asked

17  for her phone number. Plaintiff called Carol and asked if that was ok. She said "of course". Plaintiff gave it to the

18  Captain. An hour later Plaintiff called him and asked the captain what happened. The Captain said "she filed a

19  harassment complaint against you, so don't call or contact her again". Plaintiff asked "Why". He hung up. Plaintiff

20  obtained a copy of the report the captain made from a telephone conversation. She was not allowed to make her

21  statement in person with witnesses. Plaintiff text her and asked if she told him that. She did not reply. Plaintiff did

22  not contact her again. Years later Ms Napier told Plaintiff what happened was the Captain said "So you are going to

23  testify for Mr Davis…" She said "he sounded threatening and all I told him is I didn't want to have any trouble".

24  Plaintiff contends all of these events establish Civil Conspiracy.

25  Several different cars began driving by the property after the fire. They slowly drove down the short two property

26  cul-de-sac, turned around and slowly drove back by. Plaintiff would call the police since he didn't know who the

27  cars belonged to and because they were all suspicious because of the fire. The officers had encouraged plaintiff to

28  report the cars and try to get pictures. One day Ikaika and plaintiff pulled the pickup well into the driveway behind

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 21

the fence, out of sight, to bring some things to the house. A car that plaintiff did not recognize drove by very slowly. There were two men in the car. This occurred weeks after the fire. Plaintiff walked out on the street to see who they were. Plaintiff recognized the driver to be Larry Hayes. Plaintiff asked why he had been driving by. Mr Hayes got out of the car and confronted plaintiff. He said something to the affect what's it to you ? Plaintiff replied because the police told him to because of the fire. Plaintiff told Hayes the man who bought the house next door had asked plaintiff to watch his house too. Hayes replied "a lot of good you are as security" Plaintiff said what does that mean ? The other man got out of the passenger side of the car. A younger man. Mr Hayes and the young man aggressively started advancing toward plaintiff. Ikaika was leaning up against the tailgate of the truck 30 feet away well out of sight behind the fence. When Hayes and his friend reached the driveway plaintiff turned and pointed to Ikaika who was standing quietly against the tailgate observing. Hayes and his friend turned and quickly got in the car and drove away. Plaintiff called the police. Plaintiff and Ikaika told them what happened. The officer, one of the ones who responded to the incident with Mary Wilson on March 23, 2019 said "you better watch out for these people". Ikaika said "I told him the same thing. They are dangerous"

Theodore Stanton another officer of the hoa who had also been driving up and down the cul de sac for months stopped. Plaintiff had complained to the police about Stanton many times. One officer told plaintiff he had just got off the phone with Stanton. He said Stanton said he was mad "because we are in court with him" This happened after Plaintiff filed a personal injury case against Mary Wilson. Plaintiff replied "I am not suing the hoa". The officer said "well he thinks you are". Not long after plaintiff sued Mary Wilson for assaulting him and forcing plaintiff to have knee surgery plaintiff took two bags of avocados Ikaika gave plaintiff. Ikaika lived on a farm. Ken, the guy plaintiff was giving the avocados to. He thanked plaintiff. The conversation was civil. Plaintiff considered him a friend or a friendly acquaintance. Ken said he was upset. Plaintiff asked why. He said the hoa is using our dues to pay for Mary Wilson's legal fees for the personal injury. The people living here cannot stop it. Plaintiff replied. "I don't give a Shit I guess it's ok to assault me Ikaika and order her dogs to bite Ikaika". Ken did not reply. Plaintiff got in the car and Ken politely thanked him for the avocados. It was basically a cordial conversation. We had always been friendly toward each other.

On July 29, 2021 plaintiff was in the truck waiting for the police. Plaintiff and his then 86 year old mother had just returned from picking up a friend's huge Hertz bus from the Hawaii Kai docks.  Mr Padilla and Regoria's van was parked in front of the property. Since plaintiff had been having years of trouble with Padilla, plaintiff's mom was

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 22

worried and went into the property to check on it. Plaintiff stayed outside in the truck. Plaintiff had been sitting there

for about thirty minutes waiting to make a report of a suspicious vehicle. Mr Stanton drove around the corner and

plaintiff recorded it with his phone. Plaintiff rolled up his window. Stanton gave plaintiff the finger as he always did

when he drove by. Stanton drove down the short cul de sac and turned around. Plaintiff recorded it in the rearview

mirror. Stanton pulled up next to plaintiff and stopped. He gave plaintiff the finger and said "fuck you asshole". This

was two weeks after the police told plaintiff that Stanton was mad because they were in court with plaintiff. Which

was not true. Plaintiff also told the police that evening that Stanton sent an email to plaintiff that said "Fuck you

asshole". The officer said "He can't do that". Plaintiff said "Well do something about it". He replied "I will".

When Stanton stopped and verbally harassed plaintiff after having done the same thing many times, plaintiff rolled

the window down and said "Hey you're harassing me". Stanton replied how is that. Plaintiff said with your mouth.

Stanton replied with your face you asshole. Then Stanton said "You wanna see harassment you asshole" Then

something to the effect get out of here you asshole and take your whore with you !. Plaintiff did not realize his 86

year old mother who had just been called a "whore" was behind the truck watching. Stanton got out of his vehicle.

(This is all being recorded on video) Stanton walked to the front of his vehicle toward the plaintiff. He said "What

are you afraid to get out of your car you pussy ?". He was presently an officer of the hoa, and a supposed appointed

security watch individual… An appointed Security individual driving up and down Willo Davis' property street

yelling fuck you asshole and giving the finger on a regular basis. Plaintiff is confused and definitely being harassed.

Plaintiff's mother heroically walks between the vehicles and says "Get the hell out of here". Stanton grabs her and

tries to sling her out of his way. Plaintiff has gotten out of the vehicle to rescue his 86 year old disabled mother.

Plaintiff takes her shoulder to get him away from her and we back up between the vehicles. Plaintiff and his mother

reach the back of the truck so plaintiff can get her safe from Stanton in the truck. Suddenly Stanton strikes plaintiff

on the left side of the head and neck. Plaintiff served the hoa a Cease and Desist demand in October of 2018. Since

then extreme violence has been instigated toward the plaintiff, and now his mother. Plaintiff had two cervical

fusions surgeries in the middle of the 2000's. Plaintiff has a bar holding the spine together. Stanton's actions are

"Intentional". Plaintiff turned to push Stanton away who had his fist in the air. Plaintiff pushed Stanton away from

him. Stanton grabbed plaintiff's shirt. Plaintiff and Stanton went down onto the ground. The phone is still recording

all of this. Plaintiff got up and said "get out of here you son of a bitch". Plaintiff escorted his bleeding mother to the

passenger seat. And helped her stop the bleeding on the back of her hand. There was a tree in flap of skin pulled

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 23

1   back on the back of her right hand. We carefully folded it back over and she held it down with a napkin to stop the

2   bleeding. Stanton got back in his car and said "Fuck you and your whore". Plaintiff found a large band aid and put it

3   on her hand after the bleeding stopped. The police arrived 15 minutes later. Plaintiff gave his statement to officer

4   Thompson, and plaintiff's mother gave her statement to officer Lorenzo. Plaintiff told them he had a video. Neither

5   of them responded or asked to watch the video. Mr Stanton drove around the corner and stopped. There was a

6   woman in his car. One of the officers told him to wait at his house and he left. Both officers had body cameras on.

7   Loenzo spent 15 minutes speaking to Willo Davis plaintiff's mother. Plaintiff spoke to Thompson and physically

8   walked him through what happened. We were never allowed a police report. Plaintiff and his mother spoke to

9   Stephen Frye the Hawaii County Prosecutor for the West side of the island and a woman in the victim's unit over the

10  phone. We spoke to him for about a half an hour about our Affidavits of what happened and the video. We asked to

11  meet with him in the conference room to view the video(s) my video and the body cam videos. He said he would not

12  do that. Plaintiff said "why not?". He said because of the epidemic. Plaintiff said we will be wearing masks and he

13  still refused After plaintiff continued to try to persuade him, Frye agreed to watch them on Zoom. Plaintiff said that

14  is impossible. Frye set up an appointment. Plaintiff had dropped off a usb device of the video with our affidavits at

15  the prosecutor's office. Plaintiff again asked if we could watch them in person. .Frye said "No"  Plaintiff called The

16  prosecutor's office in Hilo and asked them if they were meeting in person with victims. She said "Of course. Call

17  them back or write Kelden Waltgen a letter".  Plaintiff did so and Mr Waltgen did not reply. On the day and time of

18  the zoom appointment plaintiff and his mother appeared at Frye's main office reception room. Plaintiff spoke to the

19  receptionist and told her that we we had an appointment with Mr Frye. She said "Let me check" We sat down and

20  five minutes later she came out and said Mr Frye is in court. Plaintiff said that we had an appointment with him and

21  were on time. She said "That's what I was told to tell you". Frye never followed up with us and he dismissed the

22  entire case even though he had a video of what happened, and the officer's body cam videos. Two years later

23  Plaintiff was permitted to obtain the police report regarding the incident. As we read it we were in shock. Officer

24  Lorenzo stated neither my mother nor I made a statement. Plaintiff promptly ordered the body camera footage from

25  both officers. We waited for over 6 weeks. Plaintiff kept calling and asking if they received the three different letters

26  he sent. They said they knew nothing about any requests. Plaintiff finally found another number to call and the clerk

27  said I had to file the request on a specific form. She said that the records office was not going to respond to a request

28  by letter. Plaintiff finally got the videos from the police department. Plaintiff and his mother started watching them

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 24

and were shocked, and not surprised that both officers spoke to plaintiff and his mother for some time. The videos were evidence that officer Lorenzo lied in his police report. Plaintiff made a complaint and got a letter back that said it had been 17 months. Plaintiff was refused the police report. How did plaintiff know Lorenzo lied in the report ? It has been one sham and conspiracy after another for 6 years July 5, 2024.

S.   The Hawaii Civil Rights Commission got involved in 2023. After they watched all of the videos that plaintiff filed with plaintiff's complaint with the court on July 26, 2023, they decided to get involved.  They composed their own complaint and served the defendant The Kula Kai View Estates Road Maintenance Association (that also goes by the Kula Kai View Estates Community Association in different documents). At that time Faye Miller was the agent for service, and Karen Lane was the president. They responded with dodgy evasive answers. The HCRC came back and emailed their responses to plaintiff and his mother. Plaintiff's mother owns the property, so she is the main party being discriminated against. The HCRD just delivered a "Right to Sue" letter to the plaintiff. Since November of 2021, Theodore Stanton has been verbally harassing plaintiff at the security gate. When plaintiff sees his car he stops and turns on the camera well over 150 feet away. Plaintiff announces why is recording his exit and that Mr Stanton is at the gate. Plaintiff does not speak to Mr Stanton as can be seen in the videos. Mr Stanton always yells "Fuck You Asshole" and gives plaintiff the finger. Plaintiff always files a police report for Harassment. Plaintiff was granted a three year injunction from Harassment in 2022. It did not deter him from Harassing plaintiff. In 2023 the Prosecutor filed charges against Stanton for violating the injunction. Mr Stanton appeared walking with a walker trying to manipulate the court he was incapable of yelling and giving the finger to the plaintiff. Plaintiff had 6 videos at that point of Stanton harassing Plaintiff and two involving plaintiff's mother. Stanton's attorney who had been disqualified from representing the defendants in the California Central District Bankruptcy Court requested a dismissal because Stanton was not personally served with the Injunction. Stanton had many copies and seen several copies the police showed him each time he violated the injunction, after plaintiff showed the police the videos. All of the reports had videos. Only once was Stanton held responsible for violating it. The deputy prosecutor handling the case advised the plaintiff and his mother outside the courthouse to serve Mr Stanton by mail with a tracking number. Plaintiff looked up Stanton's property ownership records and sent it to him at his mailing address. Mr Stanton received it the next day. Plaintiff left a copy of proof that he was served the way she told him to. The day after that, Stanton was at the gate again. Plaintiff recorded passing through the gate yet [again]. Mr Stanton did the

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 25

1   exact same thing he always ahs and yelled "Fuck you asshole" and gives plaintiff the finger. Plaintiff called the

2   police and made a report. The officers questioned plaintiff about proper service. Plaintiff told them what the deputy

3   prosecutor said, and that plaintiff complied. They asked for the deputies name. Plaintiff had to call their office and

4

5   get it. Plaintiff called the sergeant back and gave him the deputies full name. He said thank you. Plaintiff got a letter

6   from the prosecutor's office that they received the police report. Plaintiff intends on following up with them but has

7   been very busy writing as the court can see.  The defendants have been writing declarations and filing them in

8   different cases. Karen Lane while she was still president called the police and told them plaintiff was putting grease

9   on the gate but she had no video footage to prove it. The officer told plaintiff it was not damaging the gate anyway

10  and advised her not to make a report. The same officer told plaintiff that the Cease and Desist Demand that plaintiff

11  served the hoa in 2018, "is still valid". The same officer was the one that wrote the report that instigated charges

12  against Stanton for violation of the restraining order. Mr Stanton clearly had been given "Constructive Service" by

13  the police on many occasions. Plaintiff has the right to file a new Injunction seeing Stanton claims he was not

14  properly served so it wasn't valid. Plaintiff has a very long and detailed history of Mr Stanton harassing the plaintiff.

15  One day early 2024. Plaintiff having looked at the peeling paint on the gate support posts decided to scrape sand and

16  paint them. It only took a total of 45 minutes over two days. Plaintiff took many photos of the process to document

17  that he was trying to help out. The day plaintiff spray painted the posts, after the second coat plaintiff waited to let

18  them dry to put one more coat on them. While he sat in the truck in the right of way texting. Mary Wilson and a new

19  gentleman pulled up. Plaintiff stayed in the truck and documented it on video. Minutes later the police showed up.

20  They complimented plaintiff on the nice job. Plaintiff explained he planned on one more coat. The officer said

21  Karen Lane called us to report you for malicious mischief. Plaintiff said "How is that ?" He said of course it will go

22  nowhere because you aren't doing anything wrong but I would let it go with two coats. Plaintiff said "fine no

23  problem" and left. There was some discussion with the officer about this lawsuit, but very little. So far this

24  complaint seems to be doing some good.

25        T.   There have been issues with their new attorney, such as his being verbally abusive during **one phone**

26  **call.** That was the only one and the last one that will be made with Mr Voss. Plaintiff memorialized the

27  conversation, why he called the office, for whom he wished to speak, that Mr Voss came on the line instead, and

28  what was said. Defendant's first attorney in this case Maria Cruz failed to answer the complaint. Plaintiff kept

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 26

1  contacting her asking when she was going to file it. She did not respond. Finally, she filed it the same day plaintiff

2  filed for default which was too late to file a 12(b)(6) motion.  Then Mr Voss claimed he met and conferred with

3  Plaintiff about a MSJ he planned on filing. In the surprise phone call, all mr Voss did is yell and threaten plaintiff.

4  Plaintiff recorded it. It takes one quick tap of a button to start recording a phone call. These attorneys are aware of

5  the law that they don't give their permission for a conversation to be recorded.

6          U.   The hoa elected a new secretary and a new president who turn out to be direct neighbors of plaintiff's

7  **eighty nine year old** mother. The secretary has been communicating with her. According to Ms Davis the was only

8  odd thing Mrs Shrewsberry said. Ms Davis said she is asking for donations for a new gate. Plaintiff told Willo to

9  remind her the association already owns a new gate and a new operator. Carol Napier told Plaintiff about that. She

10  said I don't understand why they haven't installed it. It turns out to be a good decision. Plaintiff was at the top of the

11  road driving in back in approximately December of 2023. A woman's car ran right into it. She broke the lava wall

12  and bent one of the gate supports that plaintiff had painted. Plaintiff took a video and spoke to the woman as she

13  tried to leave. She asked plaintiff to call her friend to come pick her up. The party did not answer so plaintiff text

14  them, told them what happened and that she needed help. Plaintiff made sure she was ok and she didn't want an

15  ambulance. Soon after that plaintiff came back home to California. The only reason plaintiff goes to Hawaii for six

16  months out of the year is to take care of his mom. One day he will have to be at her beckoned call her full time. The

17  Harassment always starts when plaintiff arrives in this subdivision. It's an obsession with tons of people in it.

18  Owners and non owners. They go all over town telling anyone that will listen that plaintiff assaulted Mary Wilson.

19  Plaintiff does not has the class not to gossip. When plaintiff went to an insurance broker to get insurance on the

20  project, the broker came right out and said this particular association "operates like a biker gang". This has turned

21  out to be true.

22          V.   Plaintiff has spoken to and emailed with the next door neighbor Dirk Steinhoefel several times in 2022,

23  and in 2023. He has sent emails plaintiff has copies of stating what he thinks about the hoa and the experiences he

24  has had with them and particularly one of the former officers.  Carol Napier and plaintiff resumed speaking in 2023.

25  She also contacted plaintiff on Facebook Messenger.

26  Since plaintiff started forwarding all the harassing emails to mr Voss, the harassing emails have decreased by 90%.

27  Shawn Loway has been sending regular Facebook messenger messages to Dirk, Carol and the Yurt couple. Dirk

28  read one to me. The defendants have been contacting residents of the subdivision, residents of the island, filing and

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 27

posting false, and forged documents regarding plaintiff, and now plaintiff's 89 year old mother. Mary Wilson and the other defendants have been defaming the plaintiff for no valid reason for more than five years.

Mary Wilson is perpetuating the conspiracy to this day. Mary Wilson has made several False police reports. She has filed False documents, and Forged documents in civil proceedings. Before the filing of the complaint Mary Wilson stated in civil pleadings that plaintiff was convicted of burglary in 1993. She and her attorney Edward Fetzer filed a list of cases were not plaintiff's name or case, and the ones that were plaintiff mostly had absolutely nothing to do with her the plaintiff or the case. But Wilson did and continues to intentionally Slander Libel Defraud and Defame the plaintiff. She and her attorney replied that "it" the Forged document, was just a "Spread Sheet". She and her attorney were also communicating with all of the owners making the same and other allegations against plaintiff.

      W.  In 2020 Karen Lane's husband, Scott Lane both defendants, left an envelope on plaintiff's driveway which stated "You don't know who you're messing with". A year later Scott Lane followed plaintiff and cut plaintiff off on the road. Plaintiff recorded it. Plaintiff drove around him. Then mr Lane drove past plaintiff to plaintiff's driveway. Plaintiff turned on the camera on his phone and recorded what happened next.  Mr Lane attempted to start an altercation after he called plaintiff a "Satanic Sodomite". Plaintiff's mother watched. Plaintiff recorded mr Lane from the time he got out of his truck until he left. Plaintiff's mother watched the entire interaction. Plaintiff called the police. One of the officer's asked if plaintiff knew what a Sodomite was. Plaintiff said no and the officer started explaining what the "bible" said about Sodomy. Plaintiff walked away. The police said they could not find mr Lane's house so they could not talk to him about what happened. A few months before this amended complaint was composed the new the Police Chief Sherry Bird ordered a new more definite police report be made regarding mr Lane. The officer that went to question mr Lane told plaintiff that he would not speak and that Karen Lane claimed it happened because plaintiff drove down their street. Plaintiff drove the entire neighborhood that day looking for property for a friend asking about buying property in that specific neighborhood. The prosecutor said the statute of limitations had passed. The Ombudsman sent a letter to plaintiff and said the statute of limitations had not passed.

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 28

**DEFENDANTS CONTINUING WRONGS (OVERT ACTS) TOLLS THE STATUTE OF LIMITATIONS.**

**UPON EVERY OVERT ACT** BY THE DEFENDANTS, CONTINUING INJURY TO PLAINTIFF [DUE TO A

SINGLE ACT - HARRISON VS VALENTINI 184 S. W. 3D 521]

Plaintiff contends the defendants have colluded with multiple unrelated parties that Plaintiff has encountered in the

past to commit overt acts of Harassment and other named torts. Namely M. Givens whom plaintiff sued for fraud

and Bethany Laird who bought a home from plaintiff's mother in 2018. Defendants have contacted multiple

unrelated individuals in California and Missouri that have nothing to do with anything that has occurred in

defendant's subdivision or with the defendants as individuals in furtherance of their Civil Conspiracy.

Plaintiff was forced to file bankruptcy in April of 2023 to discharge a Void Default judgment Mary Wilson obtained

by defrauding the district court in Kona Hawaii. During the bankruptcy proceedings Mary Wilson's attorney Edward

Fetzer appeared with full knowledge he had a Conflict of Interest for violating the California Bar Association Rules

of Professional Conduct "Prospective Client"1.18(a)(b)(c)(d). Her attorney appeared during two creditor's meetings.

Plaintiff quoted the Prospective Client rule to her attorney during the first creditor's meeting while the Trustee

listened. Plaintiff and the Trustee discussed the Conflict of Interest after the meeting. The Trustee commented that if

there were previous phone calls conducted in 2019 about Mary Wilson and the defendants the debtor, now here the

plaintiff should let the judge know what is going on. The Defendant's attorney ignored the Conflict of Interest and

filed a Frivolous Adversary. Plaintiff filed a Motion for Disqualification which Mary Wilson's attorney did not

oppose. Now in the circuit court case which is Void and of no effect the defendant and her attorney propose that the

Attorney did not oppose the motion because it was not noticed. Wilson's attorney was served electronically.

Electronic Notice constituted Constructive Notice. No duly licensed attorney would allow a motion for

Disqualification to go unopposed. The phone records of the calls were produced in Plaintiff's motion and Plaintiff's

motion was granted. Defendant Mary Wilson hired two new attorneys Peter Lively and John Monte. They filed a

12(b)(6) motion which was **Denied in whole**. During that hearing Mary Wilson's attorney Peter Lively volunteered

to Dismiss Wilson's Adversary. The parties were demanded to appear in person at that hearing. During the hearing

the Plaintiff informed Judge Yun that plaintiff was sick and would like a continuance. Plaintiff was and is suffering

from what has turned out to be a small cancer in his digestive tract. It was apparently preventing Plaintiff's bile

production. The small cancer was removed and Plaintiff is slowly getting better. Mary Wilson's attorneys prepared a

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 29

1   "stipulated" dismissal. Plaintiff had not stipulated to Dismiss. Plaintiff had filed a Cross Claim against the

2   Defendants for collecting on the judgement and attempting to collect twice. Mary Wilson is violating the

3   Bankruptcy Injunction in the Circuit court in a Void action which she and her attorney are aware that they can no

4   longer prosecute. Mary Wilson, Theodore Stanton, Larry Hayes, Shawn Loway, and Karen Kudlo wrote false and

5   misleading declarations which were filed in that case to mislead the judge in an attempt to come into question the

6   "context" of the conversation with Mary Wilson's attorney Edward Fetzer. Plaintiff had no other reason to call an

7   attorney that was licensed in California and Hawaii other that to deal with Mary Wilson and the hoa Fraud , Civil

8   Conspiracy, Harassment, Concealment, a whole host of other torts including the personal injury plaintiff sustained

9   from Mary Wilson who was the secretary of the hoa at the time she assaulted plaintiff. Plaintiff is simply amazed

10  that Mary Wilson and her attorney has manipulated these defendants to involve themselves in a case wholly

11  unrelated to them. It proves the Civil Conspiracy that John Wilson engaged in back in 2018. Even John Wilson

12  submitted a misleading and False declaration in that Void circuit court case helping advance and support Plaintiff's

13  allegations here in this case.

14          X.   The Court pointed out that Plaintiff did not describe plaintiff's Discrimination allegation. Plaintiff's

15  allegation for Discrimination results from the defendants defaming Plaintiff and violating Plaintiff's privacy by

16  spreading rumors that Plaintiff is Gay. The tort of Discrimination in this case also considered a Hate crime (plaintiff

17  is not prosecuting the defendants as an independent prosecutor) A Hate crime is intended to create Fear and cause

18  psychological and physical harm. Plaintiff contends the defendant's Hate Speech to create Bias is also intended by

19  the defendants. The defendant's Intentional Overt Acts constitute Intentional Infliction of Emotional Distress and

20  Negligent Infliction of Emotional Distress. The defendant filed more forged and misleading documents in the circuit

21  court case in Kona Hawaii just weeks ago. Plaintiff's Discrimination claim stems from the defendants intentionally

22  spreading rumors stating that they have "Knowledge" that the Plaintiff is of a different sexual orientation as they.

23  Overt Acts such as calling Plaintiff a Satanic Sodomite in front of Plaintiff's elderly mother in front of her property

24  with the full knowledge that the defendant was being video taped the entire time. Overt acts such as defendant

25  calling plaintiff's elderly mother a "whore" twice in front of her property. Discrimination for "perceived" or

26  "actual" sexual orientation in this case. Police officer Michaels conspired with the defendants when he spread the

27  rumor that Plaintiff was a "homosexual" during a follow up investigation about a stolen credit card. An unrelated

28  incident. Plaintiff contends that Michaels was acting on his own behalf when he committed Hate Speech to Carol

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 30

1    Napier. It is unknown which other Hawaii county police officers participated with the defendants in their Civil

2    Conspiracy. Plaintiff contends that at least one other officer has personally participated in the defendant's Civil

3

4    Conspiracy. The Defendant, the hoa hired a local man to act as a "security Guard" Pat this time Plaintiff does not

5    know the individual's name. He harassed the plaintiff at the hoa security gate while being recorded on the

6    defendant's security camera. Plaintiff made multiple police reports which occurred within full view of the security

7    camera. This individual has followed plaintiff more than once in the hoa subdivision yelling and screaming at the

8    plaintiff. Plaintiff captured his Overt Acts on his phone. In one instance he followed the plaintiff from the security

9    gate to plaintiff's mother's property. Two miles away from the security gate. This was recorded on video. At the

10   property the "security guard" rolled down his window. Plaintiff asked him what he wanted. The security guard

11   demanded that the plaintiff go back where he came from on video. This video was emailed to Karen Kudlo a

12   defendant. The security guard eventually moved after following plaintiff through the grocery store parking lot in his

13   vehicle, a red Hyundai,

14          Y.   Plaintiff contends that these defendants have perpetrated their Civil Conspiracy and countless other

15   Intentional Torts for 6 years and continue to do so even weeks just before plaintiff's First Amended complaint was

16   been filed on June 5th, 2024. Plaintiff was forced by the defendants to file a motion for Contempt to violate the

17   Bankruptcy Injunction with judge Yun. This motion was supported by defendant's attorney's Status conference

18   statement in which he recently filed in the Hawaii circuit court case. Plaintiff was forced to file an Objection to the

19   defendant's Proposed Judgment because the specially appearing Judge in that case interrupted defendant's attorney

20   from testifying about his having violated the Prospective Client rule 1.18(a)(b)(c)(d). Even the California State Bar

21   Investigator participated in the Civil Conspiracy by denying the plaintiff and the defendant's attorney ever spoke

22   despite her being in possession of the phone records. She stated in her letter that the phone calls were after hours,

23   and purposely did not address the two lengthy phone calls. One consisted of 19 minutes. The other consisted of

24   approximately 23 minutes. Exactly what does the investigator, the defendants and her attorney contend that the

25   plaintiff and Edward Fetzer spoke about. The Plaintiff discovered Edward Fetzer online in which his advertisement

26   on Google states he specifically prosecutes Bankruptcy and Personal Injury cases. This is specifically why the

27   plaintiff contacted him. The plaintiff and mr Fetzer discussed the defendant and legal proceedings regarding Mary

28   Wilson. Plaintiff did not call to discuss playing golf. Plaintiff was not familiar with Mr Fetzer before he contacted

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 31

1  him about the defendants. Edward Fetzer first claimed he Never spoke to the Plaintiff. He did not claim that as a

2  defense during the creditor's meetings or in plaintiff's motion for his disqualification in the bankruptcy adversary

3  proceeding. In the most recent Motion to Compel his disqualification in the circuit court case Mr Fetzer wrote in his

4  declaration that he does not "recollect" speaking with the plaintiff, and that plaintiff was not a Prospective client. A

5  less definite statement than he made in the first motion for disqualification in the circuit court case. When the

6  plaintiff went to the court to file his reply in the first motion for disqualification, the court clerk refused to file it. She

7  said the motion had been dismissed for failure to make a "Prima Facie" case. Plaintiff has never seen anything like

8  that happen in the court system. Plaintiff's attorney told plaintiff the court was "playing with" the plaintiff because

9  he was in pro per.

10  Defendants defrauded the plaintiff by billing for Mary Wilson's legal fees to a former owner of property that had

11  nothing to do with Mary Wilson. Mary Wilson used the Kula Kai View Estates Community Association and Kula

12  Kai View Estates Community Road Maintenance Association  who had paid her legal fees to bill plaintiff but

13  describing those fees as legal fees for a two page letter demanding plaintiff move a fence. Two page letters from an

14  attorney to ask a member to move a fence does not cost $7,000. The KKVERMA, KKVECA used the money to

15  defend Mary Wilson in the two tro cases. Then the hoa disguised the legal fees for her defense as charges for the two

16  page letter.

17  Plaintiff dismissed Randy Larson without prejudice but incorporates the allegations against Mr Larson in the

18  complaint with plaintiff's first amended complaint. When Mr Larson was questioned about some of his charges for

19  work he performed Mr Larson clearly stated in a text, I am going to call the association. Soon after that he started

20  repeating what the association had been telling the public for years. Namely plaintiff assaulted Mary Wilson.

21  Plaintiff properly dismissed the Hawaii State employees, Keldon Waltgen, Stephen Frye, the state of Hawaii, the

22  Hawaii County Police Department, and Randy Larson "Without Prejudice". In Plaintiff's dismissal plaintiff puts

23  these parties on Notice that if the Civil Conspiracy or any other Torts persist in any way, Plaintiff will file a separate

24  action against those parties and others if they choose to participate in defendant's continuing Civil Conspiracy.

25

26  PLAINTIFF RESERVES THE RIGHT TO AMEND THIS COMPLAINT.

27  Plaintiff is being now being treated for more serious physical and mental injuries. Plaintiff's focus on the timing of

28  events in this First Amended Complaint is not perfect. The grammar is not perfect. Plaintiff kindly requests the court

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 32

1    that if it feels the events be written in a more succinct sequence and the grammatical errors be rectified, plaintiff will

2    do so.

3

4    RELIEF SOUGHT:

5        1.   Plaintiff seeks Compensatory Damages for Defendant's actions a follows:

6

7        2.   Assault and Battery: Plaintiff alleges the defendants Mary Theodore Wilson and Stanton intentionally

8            assaulted plaintiff. Plaintiff has suffered injuries from the defendants which resulted in multiple emergency

9            room visits, surgeries, permanent injuries to his nervous system, caused plaintiff to seek pain treatment by

10           Medical specialists, damage to his previous cervical fusions, the necessity of further cervical surgery,

11           shoulder injury, knee surgery, and other ailments which are the result of defendant's violent acts which the

12           plaintiff was a victim on March 23, 2019 the date plaintiff was assaulted by Mary Wilson, and July 29,

13           2021 the date the plaintiff (and his 89 year old mother) were assaulted by Theodore Stanton.

14       3.   False Imprisonment: Defendant Mary Wilson abused the legal process by lying to the police, the prosecutor

15           and two different district court judges which resulted in the False Imprisonment of Plaintiff two times. The

16           first time, the defendant Wilson told the police that plaintiff stole her glasses and her phone (which she

17           dropped while stealing plaintiff and plaintiff's friend's personal property). Defendant caused her loss of her

18           personal property. Defendant later admitted that plaintiff did not steal her glasses or her phone. Allegations

19           she made, which resulted in false charges being lodged against plaintiff. Seeing defendant recanted her

20           claims, denied she caused the struggle for plaintiff's personal property, despite defendant admitting to

21           taking it out of the vehicle. Defendant further admitted the assault took place in her answer to plaintiff's

22           personal injury complaint.

23       4.   Civil Conspiracy: The defendants made an express agreement with another to commit a wrong. The

24           defendants named in the complaint and the First Amended Complaint have conspired against the plaintiff to

25           cause injury to plaintiff for the past five years. Defendants continue their Overt Acts which extend the

26           statute of limitations. Overt Acts in Furtherance. A tortious or unlawful act results in the furtherance of the

27           conspiracy. The plaintiff has suffered economic loss as a result

28

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 33

5. Invasion of Privacy: Defendants; are invaders of plaintiff's privacy. Plaintiff's have intentionally intruded, physically and otherwise upon the solitude or seclusion of the plaintiff plaintiff's private affairs and concerns and is highly offensive to a reasonable person, the plaintiff. Defendant's have Intruded on plaintiff's Privacy, Appropriated plaintiff's Name or Likeness, Publicly Disclosed plaintiff's Private Facts, and Painted plaintiff in a False Light. Plaintiff has suffered and economic loss as result

6. Libel: Defendants have published in writing Fakse statements about plaintiff which have resulted in damage to his reputation. Plaintiff has suffered actual damages such as Shame, Mortification, and Pain and Suffering. Assumed damages, and Punitive damages. Plaintiff prays for compensatory damages because he has suffered harm to his reputation. Plaintiff has suffered Presumed damages at the court's discretion. Punitive damages for Libel to punish the plaintiff for the particular egregious conduct and to deter such conduct in the future. The defendants have acted with Malice and Fraud.

7. Defamation per se: Defendants have made statements that are Defamatory, (inducement or innuendo). Plaintiff prays for Compensatory Damages and Punitive Damages.

8. Intentional Infliction of Emotional Distress: Plaintiff has suffered Emotional Distress from the Intentional physical Injuries Inflicted upon Plaintiff by the defendants. The defendant's extreme and outrageous conduct intentionally and recklessly has caused and causes severe emotional distress to the plaintiff's state of mind. Plaintiff prays for compensatory damages based on plaintiff's emotional distress which has caused the plaintiff to become ill and require medical attention.

9. Negligent Infliction of Emotional Distress: Defendants assaulted plaintiff's "boyfriend" while he was holding plaintiff in a close proximate distance causing plaintiff emotional distress. Defendant assaulted plaintiff's mother within a close proximate distance causing plaintiff extreme Emotional distress. Plaintiff prays for compensatory damages and punitive damages.

10. Trespass: Defendants broke into plaintiff's residence and stole plaintiff's personal property: Plaintiff prays to be made whole to replace the personal property stolen by defendants, plaintiff's discomfort and annoyance, emotional distress, and cost of restoration. Plaintiff prays for compensatory damages.

11. Trespass to Land: Defendants trespassed multiple times and tore down fences which caused discomfort, annoyance, emotional distress. Plaintiff prays for compensatory damages, and costs of restoration. for cost of restoration.

12. Negligence: Defendant intentionally caused plaintiff to incur Economic damages; medical bills, rehabilitation costs, medication costs, pain and suffering, loss of support, and Mental Anguish. Plaintiff

prays for compensatory damages, costs, and punitive damages.

13. Negligence Per Se:-*Res Ipsa Loquitur:* Defendants have breached their care of duty to the plaintiff and have acted illegally physically and emotionally injured the plaintiff. Plaintiff prays for compensatory damages, Punitive damages, and Treble damages.

14. Private Nuisance: Defendants substantially and unreasonably through their actions and their agents actions interfered with plaintiff's use and enjoyment of his residence. Plaintiff prays for injunctive relief.

15. Fraud: Defendant's intentionally placed a lien on another's property using a Void judgment that has now been disposed of in Bankruptcy court. Plaintiff prays the defendant pay punitive damages and release the lien (damage to another's title). Plaintiff prays for Negligent Infliction of Emotional distress, and intentional infliction of emotional distress for placing a fraudulent lien on a family members property. Plaintiff prays defendant also pay treble damages.

16. Fraudulent Concealment: Defendant intentionally concealed material information with the intent to deceive and defraud plaintiff. Defendant's non-disclosure of the source and expense of Mary Wilson's legal fees which defendant had the duty to plaintiff to disclose but defendants did disguise her legal fees as fees for one 3 page letter to plaintiff asking for a fence to be relocated and for defendant's costs of locating their right of way boundaries in which defendants were at fault. Plaintiff timely moved the fence from the right of way and paid for the survey. Defendants refused payments for their survey from the plaintiff by and through the surveyor. Plaintiff prays for of the return of the money defendant conned from plaintiff. Plaintiff prays for compensatory damages and punitive damages to punish the defendant for Fraud.

17. Breach of Contract: Defendant's breached their contract for their permission to place a privacy fence in defendant's right of way. Defendant was negligent due to their ignorance of their own property boundaries. Plaintiff relied solely on their advice. Defendants did not advise plaintiff to seek outside advice until after the fence was constructed. Plaintiff prays for compensatory damages and liquidated damages.

18. Violation of Plaintiff's Civil Rights 14th Amendment 34 U.S. Code 12361: Plaintiff prays for compensatory damages and punitive damages for defendant's egregious and outrageous acts.

19. Discrimination on Sexual Orientation: Defendants intentionally discriminate against plaintiff due to plaintiff's sexual orientation. Plaintiff prays for compensatory damages and punitive damages for economic damages and emotional distress damages.

20. Continuing Wrongs: Defendants persist in their Overt Acts despite Notice given by Plaintiff to Cease and Desist. Plaintiff Prays for Compensatory damages, Injunction from Continuing Injury, and Punitive damages

Plaintiff prays: 1. Defendant pay plaintiff's Medical bills of approximately $639,000 and all costs.

2. Plaintiff prays for Punitive and Treble Damages on all counts.

3. Plaintiff prays for an Injunction from further injury by the Defendants and their agents.

CERTIFICATION AND CLOSING:

Under Feral Rule of Civil Procedure 11, By signing below, I certify to the best of my knowledge, information and belief that the complaint, and amended complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation: (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law: (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery: and (4) the complaint otherwise complies with the requirements of Rull 11. A. I agree to provide the Clerk's Office with any changes to my address where one-case related papers may be served. I understand that my failure to keep a current address on file with the clerk's Office may result in the dismissal of my case.

June 5, 2024

Kent Davis, in pro per

PLAINTIFF'S FIRST AMENDED COMPLAINTJURY TRIAL DEMANDEDJUDGE WATSON - 36